

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: April 8, 2020

225 BROADWAY
SUITE 715
NEW YORK, NY 10007
T: 212 323 6922
F: 212 323 6923

# MEMO ENDORSED

March 31, 2020

**VIA ECF**

The Honorable Edgardo Ramos
United District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

RE:   *United States v. Johnny Nunez*
       20 Cr. 239 (ER)

> A bail hearing will be held on April 10, 2020, at 10:30 AM by phone. The parties are directed to call in using the following conference call information: (877) 411-9748; Access code: 3029857.
> SO ORDERED.
>
> _____
> Edgardo Ramos, U.S.D.J
> Dated: April 8, 2020
> New York, New York

Dear Judge Ramos:

   I represent the defendant, Johnny Nunez, in the above referenced matter. Mr. Nunez is being held at the MCC while his case is pending. Given the ever-worsening COVID-19 pandemic, I am writing to respectfully request that this Court allow Mr. Nunez to be released on bond, pursuant to 18 U.S.C. § 3142(i) and 18 U.S.C. § 3145 (c). Specifically, counsel is proposing that the Court grant Mr. Nunez a Personal Recognizance Bond co-signed by two financially responsible people with the standard conditions, electronic home monitoring, and release on his own signature with two weeks to have co-signers sign the bond. If this request is granted, Mr. Nunez will reside with his aunt, Robin Turner, at 820 Theriott Avenue, Apt 6F, Bronx, New York 10473. The proposed co-signers are Pablo Encarnacion, a social worker who makes approximately $30,000 a year and Michael Delts, who works for the Department of Transportation and makes approximately $62,000 a year. It is important to note that the instant case was the subject of a criminal charge in state court. While that case was pending, Mr. Nunez was released by the state court and attended each Court appearance as required by the Court. Therefore, the defense submits that Mr. Nunez is not a danger or a risk of flight. In any event, a less restrictive means to secure his attendance in Court exists especially in light of the current health crisis that has resulted due to the COVID-19 pandemic.

   Mr. Nunez, as an incarcerated person, is at a high risk for contracting COVID-19. Specifically, Mr. Nunez has prostate cancer and was scheduled for surgery prior to his arrest in this case. BOP released a list of inmates that it deemed "high risk" and Mr. Nunez was on that list.

**I.      Mr. Nunez should be granted bond because his presence at the MCC heightens the risk of infection to himself, other inmates at the MCC, MCC staff, and the New York City community.**

New York City is facing a serious and urgent public health crisis. On March 11, 2020, the World Health Organization officially classified COVID-19, the respiratory illness caused by a novel strain of coronavirus, as a global pandemic.[1] On January 21, 2020, Washington State announced the first confirmed case in the United States.[2] Only two months later, COVID-19 has infected over 41,701 people across the United States, leading to at least 537 deaths.[3]

The exponential rate of coronavirus infection is unparalleled. The first case of coronavirus in New York State was announced on March 1, 2020. Less than two weeks later, New York State reported 325 positive cases. To date, the state has amassed 20,878 confirmed cases of the virus, with 157 deaths.[4] In a five-day period between March 15 and March 20, New York State experienced a ten-fold increase in new confirmed cases of COVID-19.[5] As of March 23, 2020 in New York City, there are 13,115 positive cases and 125 deaths resulting from the virus.[6] Most cases are in men in their 30s and 40s. Id. New York City is an epicenter of the pandemic.[7]

In response to this public health crisis, Gov. Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[8] Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020, banning gatherings of more than 500 people.[9] On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home, requiring individuals to maintain six feet of distance between each other.[10] The same day, the Federal Emergency Management Agency (FEMA) declared New York "a major disaster."[11]

---

[1] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.
[2] First Patient With Wuhan Coronavirus Is Identified in the U.S., The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.
[3] See Coronavirus Map: Tracking the Spread of the Outbreak, The New York Times (March 23, 2020), at https://nyti.ms/2t6WE75 (updating regularly).
[4] Id.
[5] Watch How the Coronavirus Spread Across the United States, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/interactive/2020/03/21/us/coronavirus-us-cases-spread.html.
[6] Coronavirus, New York City Health (Mar. 23, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).
[7] Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.
[8] At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus, New York State (Mar. 11, 2020) at https://on.ny.gov/2TKzIoz.
[9] DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned, The New York Times (Mar. 12, 2020).
[10] Novel Coronavirus (COVID-19), New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).
[11] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

While adults over sixty years old and people with chronic medical conditions are at a heightened risk for COVID-19, young, otherwise healthy individuals are not immune from infection. **Mr. Nunez has been diagnosed with prostate cancer which greatly increases his risk of COVID-19**. According to the Centers for Disease Control and Prevention (CDC), nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[12] In New York, 18- to 49-year-olds comprise more than half of all cases in the state. In New York City, 57% of patients are male.[13] With thousands of confirmed cases in New York City that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

### a. Conditions of confinement create the ideal environmental for the transmission of coronavirus.

"Prisons are petri dishes for contagious respiratory illnesses."[14] Inmates cycle in and out of Bureau of Prisons (BOP) pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing. On March 21, 2020, an inmate at Metropolitan Detention Center (MDC) tested positive for the coronavirus.[15] The individual "complained of chest pains on Thursday, a few days after he arrived at the facility."[16] When he first arrived at the facility, according to authorities, he was asymptomatic. The effect on the population at MDC remains to be seen, but as the chief physician at Rikers Island cautioned, "A storm is coming."[17]

Given what we know about COVID-19, the BOP's quest to contain the infection seems futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[18] But public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[19]

---

[12] *Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.*, The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.

[13] See NYC Dept' of Health Daily Data, March 23, 2020, available at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary.pdf.

[14] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[15] *1st fed inmate tests positive for coronavirus*, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

[16] *Id.*

[17] *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

[18] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[19] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

Internationally, prisons have proven ripe for the rapid spread of COVID-19. In China, officials confirmed 500 cases of coronavirus in prisons.[20] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[21] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[22]

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[23] One day later, on March 21, 2020, it became clear that no fewer than 38 people have tested positive.[24] At least 58 additional people are being held in contagious disease and quarantine units in the city's jail system.[25] But the cases are not abating. The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[26]

### b. The MCC is unprepared for a coronavirus outbreak.

As of March 30, 2020, counsel was informed by federal defenders that four inmates have tested positive at the MCC and that three units are locked down on quarantine. These units are on quarantine because symptomatic inmates were taken out of them for testing, but the results have not yet been received. It appears that the symptomatic inmates were brought back to these same units and remain there while they await test results. Mr. Nunez is housed in unit 5-N, and although his unit has not been placed in quarantine yet, he is a kitchen worker and has been continuing to work in the kitchen, alongside individuals who have now been placed in quarantine because someone in their unit tested positive. Mr. Nunez informed counsel that he has been experiencing headaches, a cough, and have been feeling slightly weak.[27]

Inmates at the MCC -- a massive pretrial detention facility housing approximately 700 people -- are at grave risk of contracting the virus.[28] The medical care at the MCC has repeatedly

---

[20] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

[21] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.

[22] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020), at https://cnn.it/2W4OpV7.

[23] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] The defense has conferred with the Government and the Government intends to oppose this application.

[28] See U.S. v. Shakeil Chandler, 19 Cr. 867 (PAC) ECF No. 16 at 12-22 (S.D.N.Y. March 23, 2020): Affidavit of Jonathan Giftos, M.D. (hereinafter "Giftos Affidavit").

failed to adequately address even routine medical conditions, including for Mr. Nunez;[29] in times of crisis, medical care at the facility has halted entirely.[30]

On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, the Bureau of Prisons announced a 30-day suspension of all visits to all federal correctional facilities. But prohibiting visits to correctional facilities is insufficient to stop the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[31]

To prevent new infections, the CDC strongly recommends (1) thorough and frequent handwashing, (2) cleaning surfaces with Environmental Protection Agency approved disinfectants, (3) keeping at least six feet of space between people, and (4) social distancing.[32]

To date, the MCC has not met the most basic recommendations of the CDC for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where most individuals, including Mr. Nunez, are double-bunked in a single cell, sharing a toilet and sink with a cellmate and a common shower with at least sixteen other people. In the days since March 13, the MCC has not issued sufficient hand soap to inmates. Because commissary is currently closed, the limited soap available must be used not only for handwashing, but also for showers and washing clothing; no one is allowed to purchase additional soap.

In addition to unhygienic living conditions, frequent movement between units at the MCC over the past several weeks will spread the virus. In New York City jails, where there have been at least 38 confirmed cases of coronavirus, the Board of Correction chairwoman stated, "[i]t is likely that these people have been in hundreds of housing areas and common areas over recent weeks and have been in close contact with many other people in custody and staff."[33] The MCC will encounter the same obstacle to cabining the spread. For eight days at the end of February through the beginning of March, the MCC was on total lockdown. During that period, inmates report that they were frequently shuttled among various housing units as officers searched for contraband. This movement once the spread of the virus was underway likely facilitated further spread at the MCC.

---

[29] See e.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016, at https://bit.ly/39JRhdW.

[30] According to the Federal Defenders, during the recent eight-day lockdown at the MCC, inmates on one unit reported having been forced to share one toilet, one shower, and one sink among twenty-six people, and were prevented from washing their clothing: prime conditions for the spread, rather than containment, of infectious disease. On other units, toilets overflowed in two-man cells, spreading raw sewage. Inmates with serious medical conditions, including AIDS and anemia, were denied medications or medical care. Female inmates were denied feminine hygiene supplies. No clean drinking water was provided; inmates were forced to drink from their bathroom sinks.

[31] Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[32] See Giftos Affidavit.

[33] 38 positive for coronavirus in NYC jails, including Rikers, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

The MCC's solution to curtailing all visits for 30 days -- providing additional phone minutes at no charge -- creates yet another public health hurdle. The MCC has given each inmate an additional 200 phone minutes, bringing the total to 500 minutes. But with the extra phone time comes swarms of crowds. The phones in Mr. Nunez's unit remain in constant use and are inadequately cleaned, creating more opportunity to spread infection.

With each additional arrest comes increased risk of spreading the virus in MCC. Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility. There, they are held with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of infection: the individual who tested positive for coronavirus at the MDC on March 21 first was incarcerated only a few short days before becoming symptomatic.[34]

Notwithstanding a confirmed case of coronavirus at MDC, the MCC remains unprepared for an outbreak. According to the Federal Defenders, the facility does not currently have the ability to test for coronavirus and there are no general screening protocols in place. Only if an inmate self-reports symptoms will he be screened for the virus. If symptomatic, the inmate will be "isolated" in his cell, exposing cellmates to risk. The MCC has only thirty N-95 masks and no one, including correction officers, is allowed to have hand sanitizer because it is alcohol based. The use of gloves remains discretionary among officers.

Given what we know about coronavirus, conditions of confinement generally, and the lack of preparedness at the MCC, the fact that there are no confirmed cases of COVID-19 to date at the MCC reflects the fact that the MCC lacks the ability to test for the virus. It does not mean that no one in the facility is infected.

        **c.**        **The federal judiciary has begun to set bail conditions for previously detained individuals in light of the coronavirus.**

The judiciary has recently begun to recognize and address this exceptional crisis. On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the Metropolitan Detention Center could present a "danger to the community"—the staff and inmates inside the jail—by potentially bringing the virus into the facility. *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020). A week later, conditions worsened exponentially.

In *United States v. Kintea McKenzie*, 18 Cr. 834 (PAE) (March 30, 2020), Judge Engelmayer released a defendant who had pleaded guilty to one count of assault with a dangerous weapon as part of a conspiracy with the Nine Trey Gangsta Bloods. The Court in *McKenzie* held that 18 U.S.C. § 3145(c) created a narrow exception to the general rule of detention. *See United States v. McKenzie* Decision and Order at 4, annexed hereto as Exhibit A. The Court in *McKenzie* wrote that 18 U.S.C. 3145 (c) "provides, in relevant part, that: 'A person subject to detention

---

[34] See 1st fed inmate tests positive for coronavirus, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

pursuant to section 3143(a)(2) . . . , and who meets the conditions of release set forth in section 3143(a)(1) . . . , may be ordered released, under appropriate conditions, . . . if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.' 18 U.S.C. § 3145(c) (emphasis omitted).  The conditions of release set forth in § 3143(a)(1) require a finding by the court 'by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community.' 18 U.S.C. § 3143(a)(1). '[E]xceptional reasons' permitting the release of a defendant subject to mandatory detention are those that 'present a unique combination of circumstances giving rise to situations that are out of the ordinary.'  United States v. DiSomma, 951 F.2d 494, 497 (2d Cir. 1991).  The Second Circuit has explained that, in determining whether exceptional reasons exist, 'a case by case evaluation is essential,' and a district court's discretion 'is constrained only by the language of the statute: 'exceptional reasons.''  Id.; see United States v. Hugo Witter, No. 19 Cr. 568 (SHS), Dkt. 40 at 2 (S.D.N.Y. Mar. 26, 2020).

In *McKenzie*, Judge Engelmayer held that exceptional reasons existed due to the current health crisis writing, '[t]he Court further finds that exceptional reasons again justify Mr. McKenzie's release on these conditions.  The heightened risk to Mr. McKenzie of serious complications from exposure to COVID-19 is undisputed here; indeed, the MCC itself has identified Mr. McKenzie as a 'high risk' inmate.  As several courts have already recognized, the heightened threat posed by COVID-19 to an inmate with a documented respiratory condition in a detention facility with multiple confirmed cases "present[s] a 'unique combination of circumstances,' DiSomma, 951 F.2d at 497, justifying release under § 3145(c).  See, e.g., Witter, No. 19 Cr. 568 (SHS), Dkt. 40 at 2–3 (granting bond pending sentencing, pursuant to § 3145(c), to defendant who had pleaded to a narcotics offense)."  *United States v. McKenzie* at 5.

On March 19, 2020, thirteen days after having remanded defendant Dante Stephens, Judge Nathan reversed herself "in light of circumstances that have changed since the March 6 hearing," namely, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020).  In setting bail, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19.  *Id.*  Similarly, on March 19, 2020, the threat of coronavirus led this Court to release a formerly detained individual on bail. *See United States v. Santiago Ramos*, 20-CR-04 (ER).

The bail calculus for defendants who were previously detained has shifted in light of COVID-19.  In *USA v. Estime*, 19 CR 711 NSR (SDNY) (March 27, 2020) a 33 year old defendant with no medical issues was released upon consent although the defendant had a prior drug conviction.  In *Estime*, the defendant had been charged as part of a drug conspiracy wherein it was alleged that cocaine was imported from the Dominican Republic.  The defendant had been remanded.

In *United States v. Reinaldo Roman*, 19 Cr. 116 (March 27, 2020), the defendant in a drug case was released post-plea over strenuous government objection.  In *United States v. Hugho Witter*, 19 Cr. 568-02 (SHS) the Court released a defendant in a ten-year mandatory minimum drug case post-plea over government objection, finding that "COVID-19 presents an unprecedented public health crisis," that because "the virus has infiltrated the Metropolitan

Correctional Center…both Witter's age and medical condition elevate his risk of complications from the virus," and "the fact that defendant takes Lisinopril, an ACE inhibitor, to treat his hypertension likely places him 'at higher risk for severe COVID-19 infection.'")

In *United States v. Lopez*, 19 Cr. 323 (JSR) (March 23, 2020), the Court denied the Government's request for revocation and detention of defendant who pleaded guilty to conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and use of a firearm in relation to a drug trafficking crime, finding that "the coronavirus situation does create, on its own, an exceptional circumstance possibility," "the number of [coronavirus cases] has been increasing by a substantial percentage each day," the pandemic "creates a danger if [the defendant] is placed in a prison facility, regardless of where that facility is, while the virus is still increasing exponentially throughout the United States," and "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want."

In *United States v. Baker*, 20 Cr. 125 (KMK) (March 24, 2020), the Court released a defendant who was previously detained on consent without prejudice.  The defendant in *Baker* was charged with conspiracy and possession with intent to distribute controlled narcotics substances.

The Court in *United States v. Almaleh*, 17 Cr. 25 (NSR) (March 22, 2020) released two elderly defendants charged with conspiracy to commit bank fraud, bank fraud, wire fraud, and false statements to the FDIC upon the consent of the government consent because of high COVID risk to defendants.  The defendants had previously been released on bail, but were remanded to detention for continuing criminal conduct and violations of the terms of their release.

In *United States v. Vizzari*, 19 Cr. 767 (VSB) (March 20, 2020), the Court released a defendant awaiting sentencing who pleaded guilty to possession with intent to distribute heroin and violation of parole in a prior conviction for possession with intent to distribute heroin, because his age and health conditions presented exceptional risk to contract COVID-19.

The Court in *United States v. Perez*, 19 Cr. 297 (PAE) (March 19, 2020), released a defendant over the Government's objection that defendant (1) posed a substantial risk to the community as demonstrated by his four prior felony convictions and multiple instances where defendant committed crimes while on pre-trial release and parole and (2) posed a severe flight risk as demonstrated by his flight and detention for bail jumping in the instant matter as well as eight prior arrests for failure to appear.  The Court released the defendant who was charged with attempted inducement of a minor to engage in illegal sexual conduct, because his lung condition and age placed him at severe COVID risk.

In *United States v. Calvin Hudson*, 19 Cr. 496 (CM) (March 19, 2020), the Court released a defendant charged with narcotics conspiracy, loansharking, and extortion due to the COVID crisis and the ensuing difficulty of his attorneys in meeting defendant in preparation for his approaching trial.  In *Hudson*, the defendant's bail application was twice denied due to the danger he posed to the community based on the violent nature of the charges.

In *United States v. Brandon*, 19 Cr. 644 (GBD) (March 19, 2020), the Court released a defendant on his own recognizance over the Government's objection because of the COVID risk.

The defendant was awaiting sentencing on a guilty plea to escape from federal custody in failing to report to a halfway house based on an underlying 24-month sentence for violation of his supervised release from a 2009 conviction for access device fraud and identity theft.

In *United States v. Estrada*, 18 Cr. 18 (ALC) (March 16, 2020), the Court allowed a defendant charged with narcotics conspiracy and possession with intent to distribute narcotics to withdraw his previously entered guilty plea and reinstate his bail in part because of the COVID crisis.

## **Conclusion**

In the throes of this public health crisis, the Court must release Mr. Nunez to protect his physical health.  Given the unprecedented and extraordinarily dangerous situation COVID-19 presents, it is respectfully requested that this Court allow Mr. Nunez to be released on bond.  The Court's time and consideration of this request are greatly appreciated.

Respectfully submitted,

/s/

Calvin H. Scholar

cc:     United States Attorney for the
        Southern District of New York